FORM 17. Informal Reply Brief

Form 17 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMAL REPLY BRIEF OF PETITIONER/APPELLANT

**Case Number:** 23-2120

**Short Case Caption:** Golden v. Samsung

**Petitioner/Appellant:** Larry Golden

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 15 pages.

You may attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Do not attach material already attached to your informal opening brief. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

1. Have you received a copy of the respondent/appellee's response brief?

☑ Yes ☐ No

**STOP:** You may use this form to respond to arguments raised in the brief of respondent/appellee. If you have not received that brief, you may not file this form. **Do not proceed or file this form if you answered "No."**

2. What are your arguments in response to the respondent/appellee?

Respondent/Appellee's entire response was spent relitigating a Government " Takings" case Golden v. US Case No. 13-307C to defend the Trial Court's decision to comply with the "takings" of Golden's property without paying just compensation by violating Golden's money mandating substantive right of due process before the "takings" of Golden's property under the Fifth Amend.

RECEIVED

SEP 19 2023

United States Court of Appeals
For the Federal Circuit

3. Are there other arguments you wish to make? ☑ Yes ☐ No
If yes, please state them.

The Court of Federal Claim' s Opinion in Golden v. US Case No. 13-307C, "sensors are not "native" to the manufacture of the accused products" , precludes Samsung from relitigating the Smartphone The Federal Circuit' s Opinion in Golden v. Google CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product" , precludes Samsung from relitigating the Smartphone. In the Western District of Texas Court; in Touchstream Technologies Inc. v. Google LLC, Case No. 6:21-cv-00569-ADA precludes Samsung from claiming an affirmative defense under 28 U.S.C. § 1498 for patent infringement and software modification. The Trial Court is complicit with the "takings" of Golden's property in Golden v. US Case No. 13-307C

Date: 09/18/2023

Signature: Larry Golden

Name: Larry Golden

## SAMSUNG'S "*USE*" OF PLAINTIFF'S PATENTS DIRECTLY INFRINGES UNDER § 1498(a)

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

> Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:
>
> > *"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or **used** by the government itself, without just compensation, any more than it can appropriate or **use** without compensation land which has been patented to a private purchaser."*

## 28 U.S.C. § 1498(a) (emphasis added)

Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit of the Government." *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir.2009); *see* also *Madey v. Duke University*, 413 F. Supp.2d, 601,607 (M.D.N.C. 2006) ("A ***use*** is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v. Amerada Hess, Corp.*, 999 F. Supp. 938,940 (S.D. Tex. 1998)). In *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (197 6), for example, the court held that a satellite program to advance the military defense and security of the United States was "for the Government." *Id.* at898.

In *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "***used*** or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "***use*** or

manufacture" of the patented invention must be done without license or lawful right—i.e., "***use*** of an invention that, if done by a private party [Samsung], would directly infringe the patent."

## Jurisdiction

The United States Court of Federal Claims has jurisdiction to adjudicate claims alleging [that] an invention described in and covered by a patent of the United States is ***used*** or manufactured by or for the United States without license of the owner thereof or lawful right to ***use*** or manufacture the same . . . [seeking] recovery of. . . reasonable and entire compensation for such ***use*** and manufacture. [T]he ***use*** or manufacture of [a patented] invention by a contractor [Samsung], a subcontractor, or any person, firm, or corporation /or the Government and with the authorization or consent of the Government, shall be construed as ***use*** or manufacture for the United States.

## Samsung's "*use*" of Plaintiff's Patented Smartphone Sensing Device

In *Golden v. US* CFC Case No. 13-307C, Plaintiff alleged sufficient facts to plausibly establish that Samsung's ***use*** of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances "e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned [Samsung's] ***use*** of a patented invention when it issued a solicitation [emphasis added: the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* solicitation] that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*,806 F.2d at 1060.

Samsung was awarded a cooperative agreement to assemble and commercialized a new, improved upon, and useful cell phone capable of chemical, biological, and radiological detection.

> "S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology

developed for government purposes." *Official website of the Department of Homeland Security Cell-All: Super Smartphones Sniff Out Suspicious Substances*

Under the DHS *Cell-All* initiative, Samsung entered into a contract with the Government to assemble and commercialize the new, improved upon, and useful cell phone devices that are capable of chemical, biological, and radiological detection; developed by the other third-party contractors of the DHS Cell-All initiative: Qualcomm, NASA, Synkera, SeaCoast, and Rhevision for the development and manufacture of the CBR sensors and detectors, and CPUs.

The CFC Court knew, or should have known, that the cell phone sensing device could never be "suitable for use" without the inclusion of the CBR sensors and detectors, and CPUs of Qualcomm, NASA, Synkera, SeaCoast, and Rhevision.

The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore "suitable for use". Plaintiff's cell phone sensing device limitations requiring CBR sensors/detectors and CPUs was rejected by the CFC Court as enhancing or enlarging the case, and was thereby dismissed.

Where the same issue of alleged patent infringement; using the same patent claims of Plaintiff's '287, '439, and '189 patents; that included ATAK-CBRNE plugins manufactured for, and by the United States (i.e., DoD/DTRA) was reviewed by the Federal Circuit for a smartphone (i.e., a new, improved upon, and useful cell phone device that's capable of chemical, biological, and radiological detection) in *Golden v. Google LLC.*

## The Federal Circuit Issued a Decision on Plaintiff's Patented Smartphone

### "*Vertical Stare Decisis*"

Vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court [Trial Court] must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the

District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" …" Three-Judge Panel DISCUSSION:

> "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."
>
> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google [emphasis added: Samsung] case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…."

The Federal Circuit has developed a large body of precedent governing patent cases: how to interpret patent claims, how infringement must be proved, how invalidity must be established, and how damages must be calculated. Successful patent litigation in the Northern District of California Court [Trial Court] requires diligently the following of the Federal Circuit's pronouncements on those issues.

Vertical stare decisis, is the obligation of the Northern District of California Court to follow the decision of the United States Court of Appeals for the Federal Circuit that falls within

the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy. The smartphone(s) infringe "in a relatively straightforward manner" …

The Trial Court failed to apply the "*vertical stare decisis*" doctrine.

## Samsung and Google's Collaboration on Android Smartphone Devices

Google and Samsung have had a long history of collaborating on Android devices. Arguably, every Galaxy phone released has had some level of collaboration between the two. However, the Galaxy Nexus S was the first deeper collaboration between them while the Google Pixel 6 series is the most recent.

The two companies have been collaborating on Android-based devices almost from the very beginning of the Android story. It was only two years after Android was released that the two companies partnered on the development and design of the Google Nexus S and its successor, the Galaxy Nexus.

The Google Nexus S was the fourth in a successful series of smartphones made by Google that were targeted at developers and Android enthusiasts and was released in 2010. It was also the first smartphone to feature near-field communication (NFC). Samsung did the engineering and production of the device, but it was sold under the Google banner. It featured a Samsung Hummingbird S5PC110 SoC (later renamed Exynos 3110) with a single-core 1 GHz Arm Cortex-A8 processor.

in 2018, Google acquired the HTC mobile design team for US$1 billion. It is this team that designed and developed the Google Pixel series, including the new 6. However, Google tapped its old Nexus S collaborator Samsung to help it design and develop the semi-custom Tensor SoC that lies at its heart.

Although the Tensor SoC has Samsung Exynos labelling, it is very much a Google chip in that it will appear in the Pixel 6 series. It is a mix of Samsung Exynos architecture in terms of Samsung's technical implementation of the Tensor's 2x and Google's silicon IP. Google's silicon level contributions include neural cores and ISP cores among others. It is also fabricated on Samsung's latest 5 nm process.

The common thread between the Google Nexus S and the Google Pixel 6 series, however, is their shared partnership between Samsung and Google. The two are likely to partner

on the Tensor 2 (the rumored GS201) as well, so we can expect to see a continuation of this recently rekindled and deeper smartphone partnership in the immediate future.

The Galaxy Nexus (GT-I9250) is a touchscreen Android smartphone co-developed by Google and Samsung Electronics. It is the third smartphone in the Google Nexus series, a family of Android consumer devices built by an original equipment manufacturer (OEM) partner. The phone is the successor to Google's previous flagship phones, the Nexus One and Nexus S. The Galaxy Nexus is the result of co-branding between the Samsung Galaxy and Google Nexus brands of Android smartphones. The Galaxy Nexus was available for sale on the Google Play Store until 29 October 2012, when it was succeeded by the LG Nexus 4.

## SAMSUNG IS "BARRED" FROM CLAIMING 28 U.S.C. § 1498(a) AS AN AFFIRMATIVE DEFENSE

In *Golden v. US* CFC Case No. 13-307C, Samsung ***repeatedly denied*** ever manufacturing a smartphone for the Government; ever performing work under contract for the Government in the DHS S&T *Cell-All* initiative; or, ever assembling its smartphones to include any product developed by or for the Government that enables the smartphone to detect for CBRNE agents.

In a lawsuit between private parties [*Golden v. Samsung*], 28 U.S.C. § 1498 (a) operates as an affirmative defense, where a private party's ***use*** of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement.

The CFC Court in *Golden v. US* CFC Case No. 13-307C determined the sensors and detectors NASA, Synkera, SeaCoast, and Rhevision for the detection of CBRNE compounds and agents, were not "native" to the manufacture of Samsung's smartphones; and that Plaintiff's patented CPU that was developed by Qualcomm was an enlargement or enhancement to the smartphone device and can therefore not be allowed.

Samsung was sent notice to appear to protect its interest in the CFC case, but Samsung failed to appear to rebut the Government's defense that Samsung "never manufactured a smartphone for the Government; never performed work under contract for the Government in the DHS S&T *Cell-All* initiative; and, never assembled smartphones to include any product developed by or for the Government that enables the smartphone to detect for CBRNE agents.

## Samsung is Barred by "Issue Preclusion" from Relitigating the Following:

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product", precludes Samsung from relitigating the Smartphone ***(Figure 1)***; the Central Processing Unit ***(Figure 2)***; the Camera for CBR sensing ***(Figure 3)***; the Android OS for enabling CBRNE sensing ***(Figure 4)***; the NFC sensor for enabling CBR sensing ***(Figure 5)***; at least the ambient light and spectrometer sensors for biosensing ***(Figure 6)***; and, GPS, Bluetooth, and WiFi to enable radiation detection and beacon triggers for calculating location and distance ***(Figure 7)***.

The Court of Federal Claim's Opinion in *Golden v. US* Case No. 13-307C, "sensors are not "native" to the manufacture of the accused products", precludes Samsung from relitigating the Smartphone ***(Figure 1)***; the Central Processing Unit ***(Figure 2)***; the Camera for CBR sensing ***(Figure 3)***; the Android OS for enabling CBRNE sensing ***(Figure 4)***; the NFC sensor for enabling CBR sensing ***(Figure 5)***; at least the ambient light and spectrometer sensors for biosensing ***(Figure 6)***; and, GPS, Bluetooth, and WiFi to enable radiation detection and beacon triggers for calculating location and distance ***(Figure 7)***.

| | |
|---|---|
| <br>Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising… | **Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**<br><br>**Asserted Patent Specifications**:<br><br>"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, [] … computers, laptops, notebooks, PCs, and cell phones for the receipt and transmission of signals"<br><br>"Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, [], handhelds;" |

***Figure 1***




Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung). They are also used in cars and wearable devices such as Smart Watches.

**Central Processing Units (CPUs) for Smartphone**

The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors.html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

Example: Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio.

***Figure 2***











**Camera C/B/R Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor that Rhevision and the University of California at San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can resolve a picture finely enough to detect them; system relies on the phone's camera to watch the chip for color changes.

A ***megapixel*** camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the ***pixel*** resolution phone camera. ***Megapixel*** resolution in cell phone cameras; probe a million different spots on the sensor.

***Figure 3***




The alleged infringing Samsung Galaxy S22 Ultra smartphones [Plaintiff's patented CMDC devices]; that comprises the Qualcomm Snapdragon Chipset-CPUs [Plaintiff's patented CPU devices]; that comprises the pre-loaded Android 12 Operating System (OS) [Equivalent to Plaintiff's patented "transceiver"]

**The Android Open-Source Operating System (OS) is Equivalent to Plaintiff's Transceivers**

Plaintiff's transceiver is used the same as the OS to run the ATAK-CIV application that enables the CBRNE sensors to monitor, detect, and relay data.

ATAK-MILITARY & ATAK-CIV (CBRN): "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google. com/store/apps/details?id= com.atakmap.app.civ&hl=en_US&gl=US

Samsung's pre-loaded "built-in, embedded" Android open-source operating system software, enable the infringement of Plaintiff's patents.

*Figure 4*

**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC4280584/

MIT chemists devisedmade from modified near-field communication (NFC) tags. NFC tags can be read by any smartphone that has NFC capability. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html




*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

*Figure 5*

**Android Smartphone Biosensors**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels




*Figure 6*

**Android Beacon: Bluetooth; GPS; Wi-Fi**
Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances [] or [] GPS reports jump in position but phone accelerometer sensors … Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons [] perform different tasks




The Android Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world.

*Figure 7*

Samsung openly admits the company uses *software* to modify products to function and/or operate in an infringing manor. In the Western District of Texas Court; in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) Google claimed as an Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." The jury rejected Google. Samsung is precluded from using "software modification" as a defense.

## Illustrative Claim Chart of "Elements" Precluded from Relitigating

| Elements ⬇ | Patent # 10,163,287; Claim 5 | Patent # 9,589,439; Claim 23 | Patent # 9,096,189; Claim 1 | Patent # 9,589,439; Claim 19 | Patent# 10,984,619; Claim 11 |
|---|---|---|---|---|---|
| **Samsung Galaxy S22 Ultra Smartphone** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Samsung Galaxy S22 Ultra**<br><br>**Qualcomm Snapdragon 8 Gen 1 -- Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Plaintiff's "Transceiver" is Equivalent to the Samsung Gal. S22 Ultra Android 12 & Upgraded 13 Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Samsung Gal. S22 Ultra Smartphone Chips & Sensors that Enable Detection**<br><br>**1- Android OS**<br>**2- Camera**<br>**3- NFC**<br>**4- Ambient light**<br>**5- Spectrometer**<br>**6- WiFi; GPS**<br>**7- Bluetooth** | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | at least [] a chemical sensor, a biological sensor, an explosive sensor, [] or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone | plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device | … sensors for detecting… one chemical, biological, radiological, explosive, nuclear, …capable of being disposed within, on, upon or adjacent a multi-sensor detection device | processing instructions to [] detect [] one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs) |

## THE TRIAL COURT IS COMPLICIT WITH THE UNITED STATES COURT OF FEDERAL CLAIMS "TAKINGS" OF PLAINTIFF'S PROPERTY WITHOUT PAYING "JUST COMPENSATION"

The claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'" proposes a framework for assessing the constitutionality of the Government's deliberate falsehoods. To this end, it builds on due process theory and doctrine, to identify when and how the Government's lies inflict the harms of deception and breach of trust in ways that endanger specific constitutional rights.

More specifically, it proposes that the Government's lies violate the Due Process Clause when they directly deprive individuals of life, liberty, or property; and in those extreme circumstances when they lack any reasonable justification and thus constitute an abuse of governmental power.

The Tucker Act, the principal statute governing the jurisdiction of the Claims Court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976)."

"Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). Retrieved from: Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures. **(Plaintiff-Appellant's Informal Supplemental Appendix—Exhibit A)**

As an illustration, the Model Code of Judicial Conduct and the Model Rules of Professional Conduct impose an explicit duty of truthfulness [] on government actors, and others, who are also members of the bar.

- MODEL CODE OF JUDICIAL CONDUCT R. 4.1(A)(11) (2007) (prohibiting judges and judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement");
- MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(1) (2014) ("A lawyer shall not knowingly [] make a false statement of fact or law to a tribunal…");
- MODEL RULES OF PROF'L CONDUCT R. 4.1(a) (2014) ("In the course of representing a client a lawyer shall not knowingly [] make a false statement of material fact or law to a third person[.]");
- MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (2014) ("It is professional misconduct for a lawyer to [] engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]").

Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. *See* In re *Pautler*, 47 P.3d 1175 (Colo. 2002); In re *Carpenter*, 95 P.3d 203 (Or. 2004).

Sincerely,

Date: September 18, 2023

Larry Golden

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
Email: atpg-tech@charter.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 18th day of September, 2023, a true and correct copy of the foregoing "Plaintiff-Appellant's Informal Reply Brief", was served upon the following Defendant by priority "express" mail:

Hyun Sik Byun
COVINGTON & BURLING LLP
3000 El Camino Real, 10th Floor
5 Palo Alto Square
Palo Alto, CA 94306
Phone: (650) 632-4707
Email: hbyun@cov.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

No: 23-2120

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

LARRY GOLDEN
*Petitioner*

RECEIVED

SEP 19 2023

United States Court of Appeal
For the Federal Circuit

v.

SAMSUNG ELECTRONICS AMERICA, INC.
*Defendant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN 3:23-cv-00048-WHO (23-048C) JUDGE WILLIAM H. ORRICK, III

**PLAINTIFF-APPELLANT'S INFORMAL SUPPLEMENTAL APPENDIX**

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing Pro Se

September 18, 2023

# Exhibit A

# THREE CLAIMS OF A GOVERNMENT "TAKINGS" OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSE OF THE UNITED STATES CONSTITUTION WITHOUT PAYING JUST COMPENSATION IN THE LEAD CASE 13-307C GOLDEN V. US, BY SAMSUNG AND OTHER OEMs WITHOUT ADJUDICATING THE CLAIMS.

The claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'" proposes a framework for assessing the constitutionality of the Government's deliberate falsehoods. To this end, it builds on due process theory and doctrine, to identify when and how the Government's lies inflict the harms of deception and breach of trust in ways that endanger specific constitutional rights.

More specifically, it proposes that the Government's lies violate the Due Process Clause when they directly deprive individuals of life, liberty, or property; and in those extreme circumstances when they lack any reasonable justification and thus constitute an abuse of governmental power.

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures.

As an illustration, the Model Code of Judicial Conduct and the Model Rules of Professional Conduct impose an explicit duty of truthfulness [] on government actors, and others, who are also members of the bar.

- MODEL CODE OF JUDICIAL CONDUCT R. 4.1(A)(11) (2007) (prohibiting judges and judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement");
- MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(1) (2014) ("A lawyer shall not knowingly [] make a false statement of fact or law to a tribunal…");
- MODEL RULES OF PROF'L CONDUCT R. 4.1(a) (2014) ("In the course of representing a client a lawyer shall not knowingly [] make a false statement of material fact or law to a third person[.]");

- MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (2014) ("It is professional misconduct for a lawyer to [] engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]").

Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. *See* In re *Pautler*, 47 P.3d 1175 (Colo. 2002); In re *Carpenter*, 95 P.3d 203 (Or. 2004).

## Samsung Conspired with Other OEMs to "Take" Golden's Property While Performing Work for the Government

"The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow v. Fitzgerald,* 457 U.S. 800, 814-19 (1982)."

"The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of the Claims Court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976)."

"Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). Retrieved from: Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act

## *"Takings" I*

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All*

*Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

Golden's initial "takings" begin in 2008 when the DHS made a "final decision" to take and give Golden's intellectual property subject matter to Apple, Samsung, LG, NASA, Synkera, SeaCoast, Rhevision, and Qualcomm for development and commercialization. This happened two years before the DHS cause the release of the first infringing product in 2010.

Some statistics about the award: 1) Golden was the only person (African American) to hold a patent(s) for the cell phone sensing device the Government was requesting; Golden owned the only African American company (ATPG Technology, LLC) not awarded a contract, in view of the eight other white-owned companies that was awarded to develop and assemble Golden's patented devices; and, sixty millions African Americans are the only ones who are not benefitting from the three economic stimulus packages, through the not-for-profit company (ATPG Corporation) Golden established to receive funding specifically targeted for African Americans.

According to Macrotrends, between the years 2010 – 2026, Apple's total estimated revenues are $4.5T dollars; Samsung's total estimated revenues are $3.5T dollars; LG's total estimated revenues are $.9T dollars; and, Qualcomm's total estimated revenues are $.5T dollars. The companies indirectly benefiting from the stimulus packages over the same time period is AT&T's total estimated revenues are $2.6T dollars; Verizon's total estimated revenues are $2.2T dollars; T-Mobile's total estimated revenues are $.8T dollars; and Google's total estimated revenues are $2.5T dollars.

Within the six-year statute of limitations period, in 2013 Golden filed a takings claim in the COFC. The DOJ & DHS motioned to "stay" Golden's takings claims and in 2014 the COFC court stayed Golden's takings claim until 2019.

The DOJ & DHS spent six years lying to the Court that Golden's takings claim was no different than Golden's infringement claims.

The COFC dismissed Golden takings claim because DOJ & DHS said "taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, sounds like infringement". The takings begin in 2003 and a final decision to take Golden's property [ripeness of the takings] was made in 2008. Two years before the first infringing product that included all the inventions' elements were released.

Therefore, Golden's Takings claim, for the Government taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, was never adjudicated before the case closed on November 10, 2021.

***"Takings" II***

Within the six-year period from ***10/01/2015***, Golden filed in the United States Court of Federal Claims, on ***01/17/2019*** in *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB, Golden initiated the filing of an Unconstitutional IPR-Based Takings claim against the Government, the United States.

In *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB *OPINION*. Document: 12 Page: 4 Filed: ***05/14/2019***. The United States Court of Federal Claims responded to the Government's Motion to Dismiss for lack of jurisdiction: "Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB." … "Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB." … "In sum, plaintiff's takings claim duplicates his related patent action in Docket No. 13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's Motion is granted pursuant to Rule12(b)(1) and Rule12(b)(1)."

"On Appeal from the United States Court of Federal Claims in No. 1:19-cv-00104-EGB, Senior Judge Eric G. Bruggink, in the *OPINION* for *Larry Golden v. United States* CAFC Case

No. 19-2134 Document: 37 Pages: 11-12 Filed: ***04/10/2020***. The Federal Circuit clarified the COFC's jurisdiction:

"We next turn to Golden's IPR-based takings claims. We first address whether the Claims Court had jurisdiction to hear these claims. … The government argues that the American Invents Act ("AIA")'s creation of *inter partes review* by the Board, followed by judicial review before this court, creates a "'self-executing remedial scheme' that 'supersedes the gap-filling role of the Tucker Act.'" Id. at 41 (quoting *United States v. Bormes*, 568 U.S. 6, 13 (2012))."

"According to the government, the AIA statutory scheme displaces Tucker Act jurisdiction because there is no procedural impediment to presentation of a takings claim to the agency and because the remedial scheme provides for judicial review of constitutional challenges to the agency's action. Id. at 43–49. The government's argument is without merit."

"In *Bormes*, the Supreme Court explained that Tucker Act jurisdiction is displaced "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." 568 U.S. at 12 (emphasis added). More recently, the Court explained that, "[t]o determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Horne v. Dep't of Agric*., 569 U.S. 513, 526–27 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). Thus, when there is a precisely defined statutory framework for a claim that could be brought against the United States, the Tucker Act gives way to the more specific statutory scheme. Regardless of the structure of review it establishes, the AIA is not a statute that provides for claims against the United States."

"The government is correct that, under the AIA, parties may raise constitutional challenges in our court on appeal from Board decisions. But this remedial scheme does not convert the AIA into a statutory framework for claims against the United States. The AIA is by no means "a law assertedly imposing monetary liability on the United States." Borne, 568 U.S. at 12. Accordingly, we reject the government's argument that the AIA displaced Tucker Act jurisdiction over Golden's IPR-based takings claims."

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed ***11/03/20***, Golden continued

his efforts to get the DOJ and the COFC Court to address Golden's IPR-Based Takings claims. Golden could never be time barred when the Claim was still pending in an active case.

The DOJ, the Defendant, continued to defend against Golden's "Takings" claim. In the lead case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on ***07/08/2021***, "Defendant the United States' Notice Regarding Service of The Government's Preliminary Invalidity Contentions", with more unqualified patent and publications' references.

When the United States causes injury to property, a property owner can sue in the Court of Federal Claims. This is a result of the Tucker Act, which waives the United States' sovereign immunity in the COFC only, *United States v. Mitchell*, 463 U.S. 206, 215-19 (1983).

Significantly, a suit alleging a compensable taking in the Court of Federal Claims is viable as soon as government invades a property interest without proving a statutory compensation guarantee. *Kirby*, 467 U.S. at 5; Dow, 357 U.S. at 22. The claimant need not sue in another court to "ripen" the takings suit. As the Court stated long ago in *Great Falls Mfg. Co.*, 112 U.S. at 656.

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s).

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate patents; with three unqualified patent references [Astrin, Breed, and Mostov] that does not antedate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s) with any number of unqualified references.

The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on ***11/10/2021***, which "ripen" the takings claim.

Samsung, alone with Apple, LG, NASA, Synkera, SeaCoast, Rhevision, and Qualcomm were all third-party contractors performing work for the Government under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative when Plaintiff filed his first case in the United States Court of Federal Claims against the United States ("Government"), and were all authorized to petition the United States Patent Trials and Appeals Board (PTAB) for post issue review of Plaintiff's patents.

Samsung waived its opportunity to petition the PTAB within one year of litigation, but benefited from the unauthorized government agencies (DHS & DOJ) petition for inter partes review with unqualified patent references.

## *"Takings" III*

When the DOJ & DHS insisted on a dismissal in their favor *Golden v. US* Case No. 13-307C; dismissed 11/10/2021, without proving non-infringement or that the patents are invalided, it left the patents with the "presumption of validity". Which means the government cannot appropriate or use Golden's patents without paying "just compensation".

The Supreme Court explicitly recognized that patents are property secured by the Fifth Amendment Takings Clause. In *Horne v. Department of Agriculture* 569 U.S. 513 (2013) ("Horne I"); 576 U.S. 350, 135 S. Ct. 2419 (2015) ("Horne II"), the Court held that the Takings Clause imposes a "categorical duty" on the government to pay just compensation whether it takes personal or real property.

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

> Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:
>
> > *"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without*

> *just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."*

James Madison, the author of the Takings Clause, once wrote: "Government is instituted to protect property of every sort." The Court's decision vindicates Madison's intent to limit the government's power to take property, both personal and real, without just compensation. And it extends a long line of cases recognizing that "property" in the constitutional sense subsumes all things arising from labor and invention.

The DOJ & DHS never proved Golden's patents are invalid, and yet, continues to used them without paying just compensation. The only thing the DOJ & DHS proved in the *Golden v. US* Case No. 13-307C is how much of massive liars they are. Examples of their falsehoods are:

The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which placed the case outside the COFC jurisdiction.

When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicate to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC.

The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR developed by Rhevision.

The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case. The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.

The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting. As stated in the chart above, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.

No where, did Golden claim the CPU is used as a sensor for CBR detection. Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement. Further, if the products do not have CPUs, the products cannot function

correctly. The case was dismissed because the DOJ & DHS lied to the Court.

The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use.

The DOJ & DHS made sure the sensors and detectors required to have a product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG.

The DOJ & DHS chose not to challenge the communication methods limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.

The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it.

Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones. When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices.

Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative. NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS. The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."

The DOJ & DHS created the substantive right for Golden to receive "Just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision.

After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone

"capable of" detecting for CBR agents and compounds.

Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.

The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for filing a claim in the United States Court of Federal Claims for just compensation.

It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.

The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated than *Golden v. US* case no. 13-307C.

Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.

The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.

The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed.

## CONCLUSION

Samsung's participation in the Government's takings of Plaintiff's property under the Fifth Amendment Clause of the United States Constitution without paying just compensation is not predicate on any infringement because in *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e., "use of an invention that, if done by a private party, would directly infringe the patent."

The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." The Supreme Court decided that the Sherman Act include plain arrangements among competing individuals or businesses to fix prices, divide markets, or rig bids. These acts are "per se" violations of the Sherman Act; in other words, no defense or justification is allowed.

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act.

The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

Sincerely,

Date: September 18, 2023

Larry Golden

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
Email: atpg-tech@charter.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 18 day of September, 2023, a true and correct copy of the foregoing "Plaintiff-Appellant's Informal Supplemental Appendix", was served upon the following Defendant by priority "express" mail:

Hyun Sik Byun
COVINGTON & BURLING LLP
3000 El Camino Real, 10th Floor
5 Palo Alto Square
Palo Alto, CA 94306
Phone: (650) 632-4707
Email: hbyun@cov.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

PRIORITY MAIL EXPRESS

TO SEAL

Retail

UNITED STATES POSTAL SERVICE

20439

RDC 07

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC 2960
SEP 18, 2023

$28.75

R2304E106498-08

FOR DOMESTIC AND INTERNATIONAL USE

UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

EJ 772 067 978 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE (864) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

DELIVERY OPTIONS (Customer Use Only)

[X] SIGNATURE REQUIRED *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options

- [ ] No Saturday Delivery (delivered next business day)
- [ ] Sunday/Holiday Delivery Required (additional fee, where available*)
- [ ] 10:30 AM Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE (202) 275-8000

U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
CASE NO: 23-2120
717 MADISON PLACE, NW
WASHINGTON, DC

ZIP + 4® (U.S. ADDRESSES ONLY)

20439-

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

PAYMENT BY ACCOUNT (if applicable)

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|
| | |

ORIGIN (POSTAL SERVICE USE ONLY)

[X] 1-Day [ ] 2-Day [ ] Military [ ] DPO

| | | | |
|---|---|---|---|
| PO ZIP Code: 29606 | Scheduled Delivery Date (MM/DD/YY): 9-19-23 | Postage: $ 28.75 | |
| Date Accepted (MM/DD/YY): 9-18-23 | Scheduled Delivery Time: ~~10:30 AM~~ ~~3:00 PM~~ ~~12 NOON~~ 6PM | Insurance Fee: $ | COD Fee: $ |
| Time Accepted: 10:59 [X] AM [ ] PM | 10:30 AM Delivery Fee: $ | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Special Handling/Fragile: $ | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 28.75 | |
| Weight: [X] Flat Rate lbs. ozs. | Acceptance Employee Initials: [signature] | | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | [ ] AM [ ] PM | |
| | [ ] AM [ ] PM | |

LABEL 11-B, MARCH 2019 PSN 7690-02-000-9996

PEEL FROM THIS CORNER

COURT